## 3.3 - OWWE Criteria

Customers seated at the overwing window exit row must:

- Be willing and able to assess conditions, remove the window, and leave quickly through the exit.
- Be 15 years of age or older.
- Be able to read, understand and speak in English.
- Have visual capacity to perform functions without assistance beyond contact lenses or glasses.
- Have aural capacity to hear and understand instructions shouted by Flight Attendants without assistance beyond a hearing aid.
- Not have another responsibility, such as caring for small children, that might prevent them from performing the required functions.
- Not have a condition which might cause them harm when performing evacuation duties.
- Not require a seat belt extension.

The "C" Flight Attendant must:

- Tell Customers that they are sitting at the emergency-exit row and will be required to open the exit and assist in the evacuation in an emergency evacuation situation.
- Refer these Customers to further information on the safety information card.
- Reseat Customers, as necessary, to a row other than the overwing exit row.
- Notify the Captain and Operations Agent if a Customer who does not meet OWWE seating criteria refuses to move to another seat. If this Customer has a disability, also notify the CRO (See Customer Care chapter).

### 3.4 - Deadheading Flight Attendants

Deadheading Flight Attendants preboard after disabled Customers. Deadheads should sit in the aft part of the plane unless they have a short connecting time or an aircraft holding at the next station.

Deadhead-crew reservations are booked to include two passenger seats and the fourth jumpseat. If the flight sells out, the most junior crew member will take the fourth jumpseat.

If deadheads arrive too late for preboarding, they must board with their numbered group.

If carryon space is unavailable, a CLAIM AT GATE tag should be used to check items.

If in uniform, deadheads may retrieve checked items from the ramp, staying within the footprint of the aircraft; out of uniform, deadheads should wait for the Operations Agent to retrieve their items.

Deadhead crew members should assist with cabin tidying between flights.




## 3.5 - Fourth-Jumpseat Use

Fourth-jumpseat riders are Southwest Employees authorized to occupy the fourth space on the aft jumpseat during all phases of flight.

### 3.5.1 - Guidelines for Fourth-Jumpseat Use

The fourth jumpseat is available on a first-come, first-served basis to active Southwest Employees. Advance sign-up is only permitted by Company officials traveling on Company business and by Crew Scheduling for use by deadheading crew members, Cohearts, and trainees for their initial operating experience.

Check-in for the jumpseat begins at the flight's gate podium simultaneous with Customer check-in. (Some stations have established other procedures to accommodate heavy demand.)

Fourth-jumpseat riders must meet exit-row seating criteria. Additionally, an Employee may neither sign up for, nor occupy, the fourth jumpseat if traveling with a child less than five years of age.

FAA inspectors may not ride the cabin jumpseats.

No one may use the jumpseat to change a baby.

An individual signed up for the fourth jumpseat may not consume an alcoholic beverage, regardless of whether the individual is occupying the jumpseat.

The fourth-jumpseat rider must display Southwest Airlines ID at waist-level or above while occupying the jumpseat. Jumpseat riders not in uniform must adhere to Southwest's nonrevenue dress code.

The fourth-jumpseat rider may not sleep on the jumpseat.

Reading on the jumpseat is permitted only under conditions described in Work & Conduct Rules, Class III.5.

An Employee under pass suspension may not sign up for, nor occupy, the fourth jumpseat without flight-specific, written authorization from the Employee's department head.

In the event of an oversale, a Southwest Employee traveling on a positive-space pass (Form #4765) on Company business may bump a fourth-jumpseat rider traveling on personal business or on pleasure, if the Company business requires the Employee to arrive at the final destination at a specific time that requires travel on that flight.




### 3.5.2 - Procedures for Fourth-Jumpseat Riders

1. Unless you are on a scheduled deadhead (see 2.1 - Check-In at Base), check in at the gate and fill out a Fourth Attendant Seat/ Cockpit Authorization Form. Give the pink copy to the Gate Agent and advise the Ops Agent that you are riding fourth jumpseat.
2. Preboard, introduce yourself to the "A" Flight Attendant and the Captain, give the white copy of the authorization form to the "A" Flight Attendant or Captain, and proceed to the aft-entry area. Stow carryon items behind the last row of seats or in an OHB.
3. Take your position on the aft jumpseat, aisleside, with seat belt and shoulder harness securely fastened for movement on surface, takeoff, and landing.
4. Once all Customers have boarded and you have obtained permission from a crew member, you may occupy a passenger seat.
5. You may assist Flight Attendants, as needed, when the FASTEN SEAT BELT sign is turned off. You must be seated with seat belt securely fastened while the sign is illuminated.
6. "B" Flight Attendant may request that you sit on the forward jumpseat during beverage and snack service to reduce congestion in the aft galley area. You may not occupy the forward jumpseat for landing.




## 3.6 - Irregularities

If any cabin item is inoperative or becomes inoperative during flight, the Flight Attendant will:

- notify the Captain, even if the item appears to be a minor maintenance issue
- follow the Captain's instructions on how to handle the situation

### 3.6.1 - Inflight & Provisioning Report

An Inflight & Provisioning Report must be completed anytime the following occur:

- a safety hazard to the flight, Customers, and/or crew
- emergency equipment is used
- MedLink is contacted
- an evacuation
- an abnormal situation for which the Flight Attendant believes followup by Southwest is needed

#### Location

Blank IPRs are in the Flight Attendant lounge at each base. Take a few on each trip.

#### Use

- Use dark blue or black ink.
- Give a clear and factual account of what happened.
- Be sure to fill in all specific blanks, e.g., date, tail number, etc.
- Leave emotions and opinions out of the report. It can be used as evidence in a court of law.
- Do not censor profanity in direct quotes.
- If one Flight Attendant on a flight fills out a report, the other two Flight Attendants must do so as well. (This saves the Company valuable time when trying to locate crew members involved in the situation.)
- A Flight Attendant not involved simply states, "I was not involved in the situation/incident nor did I witness the occurrence because __________."

 

- Obtain the name, address, and phone number of each Customer involved in the situation.
- Obtain names, addresses, phone numbers, and statements from several witnesses—at least three, if possible.
- If the situation is a medical emergency, obtain a medical history of the Customer involved. (See CPR-Rescue Breathing-Heimlich chapter.)
- Specify whether MedLink was contacted.
- Also include names and phone numbers of anyone providing medical assistance onboard.

### Distribution

The report must be filled out and turned in to a Base Supervisor within 24 hours after the completion of the pairing on which the situation occurred. However, if a member of Inflight management requests the report, it must be turned in immediately.

**Do not give the IPR or a copy of it to anyone not employed by Southwest Airlines**, including FAA employees. Advise any person requesting a copy to contact your Supervisor or Director.

### 3.6.2 - Flight Attendant Jumpseat Inoperative

An aircraft may be dispatched with an inoperative Flight Attendant jumpseat if:

- The passenger seat closest to the Flight Attendant's assigned exit is blocked for Flight Attendant seating.
  - "A" and "C" Flight Attendants will block two forwardmost C and D aisle seats.
  - "B" Flight Attendant will block only one seat, aisle side, in the last row.

NOTE: The location of this seat must allow the Flight Attendant to reach the exit before any Customer.

- A FOR FLIGHT ATTENDANT USE ONLY card is placed in this passenger seat.
- The Flight Attendant(s) occupy this seat for taxi, takeoff, and landing.

Report the inoperative jumpseat to the Captain so it can be entered into the aircraft log to be repaired or replaced at the next Maintenance base.




### 3.6.3 - Passenger Seat Inoperative

- Report the inoperative cabin seat number to the Captain so it can be entered into the aircraft log to be repaired or replaced at the next Maintenance base.
- The seat may not be occupied until it has been repaired.

### 3.6.4 - PA System Inoperative

In the rare event that an aircraft is dispatched with an inoperative PA, the Captain will advise the Flight Attendants in a preflight briefing.

An aircraft may be dispatched with an inoperative PA system provided the interphone system and the chime system are in normal working order. Procedures to follow in the event any part of the PA system is inoperative fall into routine and emergency categories:

#### Routine Situations

With one operable microphone in the cabin

- Pre-takeoff and enroute announcements will be made from the operable cabin microphone.

With operable microphone in the cockpit **only**

- All pre-takeoff announcements will be made using the microphone in the cockpit provided the announcements are completed before movement on the surface (sterile cockpit) begins.
- Any time the FASTEN SEAT BELT sign is turned on or off during flight, the pilot will make the appropriate announcement.

With no operable microphones on the aircraft

- Door arming/disarming notification will be communicated between the "A" and "B" Flight Attendants over the interphone.
- The pre-takeoff announcements will be delivered using the megaphone and will be limited to:
  - Deliver the entire PED/OWWE portion of the Opening PA including the "in order for us to push back from the gate" part of the PA
  - Deliver the entire Emergency PA
- The "A" Flight Attendant will deliver the PAs at the front of the cabin while the "C" Flight Attendant demonstrates the seat belt, card and mask in the forward half of the cabin. This process will be repeated with the "A" moving to mid-cabin to deliver the PAs and the "B" Flight Attendant demonstrating the equipment in the aft half of the aircraft.
- The "A" will add the following verbiage to the announcements before proceeding to mid-cabin and again at the end of the announcements delivered at mid-cabin: "After takeoff, when the Captain turns off the FASTEN SEAT BELT sign, it is recommended that you keep your seat belt fastened at all times while seated."
- Per current procedure, if there is not sufficient time to complete all PAs prior to takeoff, the PA regarding use of oxygen may be delivered after takeoff, before the aircraft reaches the altitude of 25,000 feet, using the above procedure.
- Any time the FASTEN SEAT BELT sign is turned on during flight, the FASTEN SEAT BELT Sign On PA will be made using the megaphone. Provided circumstances don't exist that would require Flight Attendants to immediately be seated with seat belts/shoulder harnesses fastened, the "A" Flight Attendant will make the PA and repeat at mid-cabin.
- The Final Descent and safety-related portion of the Arrival PA will be combined and delivered by the "A" Flight Attendant before landing using the megaphone. The announcement will be repeated at mid-cabin.

**The megaphone must be stowed and secured when not in use.**



## Emergency Situations

In the event an unplanned evacuation becomes necessary:

- the Pilots will shout either "Evacuate" or "Remain seated" in a loud, commanding voice which can be heard by the "A" and "C" Flight Attendants.
- Flight Attendants will respond accordingly, following procedures currently in place for handling these types of situations. (see Emergency Equipment & Procedures chapter).

When preparing for a planned emergency:

- the "A" Flight Attendant will use the megaphone to deliver the PA in the forward portion of the cabin with the "C" Flight Attendant performing the demonstration. The process will be repeated at mid-cabin with the "B" Flight Attendant performing the demonstration.

In the event of a decompression:

- Since no decompression PA can be made, Flight Attendants will shout instructions through their own masks to Customers seated nearby.
- Flight Attendants must be alert while taking supplemental oxygen and urge Customers through visual means, such as hand signals, to use their oxygen masks.

 

### 3.6.5 - Coffeemakers

When reporting any malfunction, please be specific about the problem. These tips for troubleshooting coffeemaker problems can help prevent unnecessary calls to Maintenance:

| problem | troubleshooting tips |
|---|---|
| Water is sputtering and not coming out in a steady flow | Prior to the first flight of the day, push the HOT WATER button and run water out of the spigot into a coffee pot. This bleeds the line and removes trapped air. (Not possible with Nordskog unit.) Then brew a pot of hot water. |
| No power is available to the coffeemaker | Ensure that the proper cockpit switches have been turned on. If galley circuit breakers are popped, report this to the cockpit. |
| Can't brew coffee | Ensure the pot locking lever is in the down and locked position. Raising this lever at any time will prevent or stop brewing.<br>Ensure the HOT WATER button is illuminated. This means that the water in the tank has reached brewing temperature.<br>Check to be sure the pot is not full. To prevent overflow, a level sensor turns off the brew cycle if it is started before the pot is empty. |
| COLD WATER button is illuminated red | Indicates that water tank is low or empty. |
| ON/OFF button does not illuminate | Press any other button to determine if the problem is only a burned-out bulb. (Pressing the LOW WATER button on the Rumbold unit tests the bulbs.) |
| Hot plate is not hot | It takes 1-3 minutes to reach the maximum temperature. (The Rumbold hot plate will not operate, even if the light is on, unless the pot-locking lever is down and locked.) |
| BREW light remains on | This light should remain on for about 15 seconds after brewing has stopped while coffee drains out of the brew cup. |
| Water drips from spigot | Press HOT WATER and COLD WATER buttons a few times to release any sediment trapped in the valves. |




## 3.6.6 - AT&T Phone System Troubleshooting

Because the system operates on radio frequencies, communication may occasionally be disrupted by tall buildings or natural conditions such as bad weather, mountainous terrain or reflections from large bodies of water.

| display reads/ problem | explanation |
|---|---|
| YOUR CALL IS ______ IN LINE | Indicates caller's place in line while the system waits for an open "line" or channel. Note: up to 4 calls can be placed from the aircraft at one time. |
| RI.00C or R1000 | System is booting up and may display this message for up to three minutes. If message remains displayed throughout the flight, handset is inoperative. |
| blank screen | Handset is inoperative |
| PLEASE WAIT or STILL PROCESSING | System is searching for a line or channel. |
| cord does not retract | Open tray table and pass handset behind tray table. Stow handset and all excess cord in seatback pocket. Close and lock tray table to hold cord in place. |

- Any Customer experiencing service difficulties or unsatisfactory call quality may contact AT&T Wireless Services' Customer Care by dialing *611 from the aircraft or 800-247-6636 when on the ground.
- Any malfunction of the system should be reported to the Captain as soon as possible. Remember to include row and seat number where the inoperative phone is located. AT&T technicians will be contacted to repair the telephone.




## 3.7 - Liquor Policy

All liquor sales and transactions must be reported to the Company.

All Flight Attendants must turn in all liquor reports, sales, and receipts each day in their RON city or before departing that RON city the next day. Drop at the RON upon arrival is strongly encouraged, because you assume responsibilities including, but not limited to, late, lost, or stolen liquor money and the corresponding disciplinary action.[1]

On the last day of the pairing, all liquor reports, sales and receipts for that day must be dropped in the terminating domicile of that pairing.

The liquor money, coupons, and LC-1s are to be placed in the liquor envelope and must be witnessed by another Flight Attendant.

A Flight Attendant must have the drop witnessed, listing the name and Employee number of both the Flight Attendant making the drop and the witness. The names must be printed legibly.

When you have conducted a jetbridge trade and have liquor money to drop, you are to drop your liquor money in the location where you end your trip/where the trade is initiated.

If a circumstance does not allow you to drop your money in the scheduled city, an Inflight & Provisioning Report stating the details of why the drop was not made must be completed and turned into your Supervisor immediately at the end of your trip.

1. Failure to drop the liquor money at the end of the work day (or before departing an RON city) will result in the Flight Attendant not being credited for the liquor money. A Flight Attendant who fails to submit payment for liquor money due within the timeframe given will receive progressive disciplinary action. Completion of an Inflight & Provisioning Report does not necessarily exempt a Flight Attendant from disciplinary action. Discipline could be issued if it is determined the Flight Attendant could have successfully dropped liquor money. A Flight Attendant who fails to meet any of the policy items as stated will be held responsible for any money not reported and/or received and must make up the difference to the Company.

## 3.7.1 - Drop Safe Locations

A drop safe is in each Station; however, due to facility changes the safe locations may also change. **When the location of the drop safe is unknown, check with the Operations Agent.**

| city | drop safe location |
|---|---|
| ABQ | baggage service office |
| ALB | behind the ticket counter, use universal code to gain access |
| AMA | behind the ticket counter in the hallway by the coat rack |
| AUS | behind the ticket counter, just inside the ticket counter door |
| BDL | ticket counter |
| BHM | ticket counter |
| BNA | behind the ticket counter |
| BOI | In checkout room behind ticket counter. If the ticket counter is not staffed, stop by the baggage service office and check with a SWA Employee. |
| BUF | baggage service office, lower level, carousel 3 |
| BUR | in baggage office (next to baggage claim area) |
| BWI | inflight lounge before the d pier, through glass double doors |
| CLE | baggage service office |
| CMH | Directly behind the ticket counter behind first door on the right. The station safe is used. |
| CRP | Behind the ticket counter, in the Supervisor's office |
| DAL | Dallas Inflight Base lounge |
| DTW | Behind the ticket counter. It is a great distance from the gate and requires directions from Operations personnel |
| ELP | baggage service office |
| FLL | ticket counter (door behind ticket counter has lock with universal code) |
| GEG | baggage service office |
| HOU | Outside the Flight Attendant lounge. Additional drop site is available on "C" side. |




| city | drop safe location |
|---|---|
| HRL | In the hall behind the ticket counter boardroom. Walk toward the Operations office and down three steps. |
| IAH | behind ticket counter |
| IND | under gate A-1 |
| ISP | in hallway outside Operations |
| JAN | behind the ticket counter |
| JAX | Baggage Service Office. If there is not a CSA in the office, one can be located at the baggage carousel to give you access. |
| LAS | baggage service office |
| LAX | baggage service office |
| LBB | in the Customer Service Supervisor's office behind the ticket counter |
| LIT | In the Agents' breakroom in the office areas directly behind the ticket counter. Same safe is used by CSAs. |
| MAF | behind ticket counter |
| MHT | ticket counter (universal code) |
| MCI | behind the ticket counter |
| MCO | customer service center next to gate 122 (universal code) |
| MDW | in Flight Attendant lounge |
| MSY | behind the ticket counter and directly in front of you as you walk through the door |
| OAK | In the Flight Attendant Lounge, Terminal One. |
| OKC | in Operations under gate C7 |
| OMA | in Operations |
| ONT | baggage service office |
| ORF | baggage service office |
| PDX | In hallway adjacent to CSA breakroom behind ticket counter. Access is through doors (universal code) behind ticket counter. |

| city | drop safe location |
|---|---|
| PHX | One safe is in Terminal 4 Inflight Lounge. The backside of the safe is in the Base Coordinator's office. An additional safe is in the old luggage closet next to the Customer Service Center at C1 (universal code). |
| PVD | behind the ticket counter |
| RDU | baggage service office |
| RNO | baggage service office |
| SAN | adjacent to baggage service office |
| SAT | in the reception office behind the ticket counter |
| SDF | baggage service office |
| SEA | baggage service office |
| SLC | baggage service office |
| SJC | in closet at the end of ticket counter |
| SFO | baggage service office |
| SMF | baggage service office |
| SNA | behind the ticket counter |
| STL | in hallway behind ticket counter |
| TPA | in Operations under gates 12 and 14 and at ticket counter |
| TUL | in the Operations office below gate 59 |
| TUS | Behind gate 21/22 office door. Need CSA to gain access. |




## 3.8 - Charters

A *charter flight* is a segment of a pairing in which the entire aircraft and Southwest Airlines' crew have been contracted ("chartered") for private use.

### 3.8.1 - Bidding for a Charter

Flight Attendants bid for charter flights. (See the Scheduling chapter for more information on the charter bid process.)

### 3.8.2 - Charter Orders

Charter orders contain all the information regarding a specific charter flight including, but not limited to:

- type of charter and number of Customers expected
- type of meal to be served, number of meals to be boarded, and where this meal will be boarded
- any special accommodations (e.g., extra pillows and blankets, complimentary liquor service, etc.)
- if preflight beverages are to be offered in the gate area or on aircraft, and by whom
- if special liquor kits are to be boarded
- assigned seating or open seating; if there are any problems, Flight Attendants are to consult the charter Operator Representative or Customer Service Supervisor
- type of cleaning service provided (if any), where provided and by whom
- on military charters, if weapons will be brought onboard
- hotel and transportation if an overnight is required (may not be the same as the regular crew hotel); Inflight Crew Scheduling will also have hotel information
- contact number for Dispatch

### Accessing Charter Orders

Charter orders may be accessed from any computer in any Flight Attendant lounge. To access charter orders:

- Log on to the Southwest Airlines Intranet by clicking on the Freedom Net icon.
- Click on DEPARTMENTS.
- Click on SELECT A DEPARTMENT.
- Click on INFLIGHT & PROVISIONING.
- Click on INFLIGHT.
- Click on CHARTER INFORMATION.
- Scroll down the column labeled Inflight and click on the applicable charter number. The date of the charter appears next to the charter number.
- Print these charter orders to take with you.

### 3.8.3 - Charter Procedures

All FAA regulations and Company policies and procedures are to be followed when working a charter flight.

Crew meals will be provided along with Customer meals.

Caterer-provided meals must be safely stowed for takeoff and landing in compliance with carryon-item policy and FARs. Literature pockets are not acceptable stowage spaces.

Trash may not be stowed in the lavatory.

Smoking is not permitted onboard.

See 3.8.5 - Charter Checklist, if necessary.

 



- Check in one hour prior to scheduled departure at the domicile where the charter flight originates.
- Be in regulation uniform, with flashlight, ID, up-to-date manual, cleaning slips, and Inflight & Provisioning Reports.
- Meet other crew members.
- Review information obtained from charter orders.
- Be at the gate at least 30 minutes prior to departure time.
- Ensure the cabin is tidy.
- Refer to charter orders to see whether additional cleaning personnel are scheduled.
- A reserve Flight Attendant assigned to a charter flight must check in with Crew Scheduling after completing the charter.
- Follow all Southwest and FAA procedures for boarding, PAs, taxi, and inflight service.



- Access and print charter orders.
- Brief "B" and "C" on specifics obtained from charter orders.
- Check that forward galley has been provisioned. Charter flights are usually double-provisioned with extra supplies and kits for the next flight. These may be placed in the cargo bin.
- Check forward lav for tidiness and supplies.
- Follow any preflight instructions included on the charter orders.
- Ensure that all Southwest and FAA procedures for boarding, PAs, taxi, and inflight service are followed.

Case 2:03-cv-01444-FCD-EFB Document 32-2 Filed 08/29/05 Page 19 of 43





• Check that aft galley has been provisioned. Notify "A" Flight Attendant, Ops Agent, Provisioning Agent, or local caterer of any discrepancies.

- Count the meals immediately upon boarding or after receiving the meals to ensure there is enough for the anticipated load. If there is not, communicate this to the "A" Flight Attendant, Captain and/or Operations Agent.
- Stow meals in overhead bins. In some stations, meals may be stowed in both forward and aft overhead bins.
- Check aft lav for tidiness and supplies.
- Follow any pre-flight instructions included on the charter orders.



• Check emergency equipment and notify "A" Flight Attendant and Captain of any discrepancies.

### 3.8.4 - Military Charters

#### Differences

- A military officer will be appointed to check the Customer manifest list on boarding and, if applicable, supervise the loading of ammunition into the cargo bin. This person is armed and his gun will be visible.
- An inspector will check the aircraft for cleanliness (galleys, ashtrays, and overall). Discrepancies should be handled by the Flight Attendants if a cleaning crew is not available.
- The inspector will also check the plane's emergency equipment and may verify the amount of equipment with a Flight Attendant.
- When the charter orders call for weapons to be carried onboard, the weapons should be placed under seats with the gun straps secured to the seat legs.
- When sufficient room is not available under the seats, guns may be placed in the overhead bins, flat on the bin floor with all other soft-sided carryon items on top.
- Military charters scheduled for four or more hours will be supplied with a snack and a meal. The snack and the meal are to be served at separate times. (See Table)



SW 000144




| flights taking off before 0930 | flights taking off after 0930 |
|---|---|
| **after takeoff:** | **after takeoff:** |
| beverages | beverages |
| meal | meal |
| refills - pick up | refills - pick up |
| **mid-flight** | **mid-flight** |
| approx. 2 hours before landing | approx. 2 hours before landing |
| beverages | beverages |
| peanuts /raisins as alternative | peanuts /raisins as alternative |
| sweet snack | salty snack |
| refills - pick up | refills - pick up |
| approximately 30 minutes before landing: | approximately 30 minutes before landing: |
| coffee/water and a single wrapped cookie | coffee/water and a single wrapped cookie |

### Refueling Stops and Military Charters

Depending on the destination, it could be necessary to land at a military base for refueling. Some bases require Customers to deplane. Flight Attendants will be advised of the regulations in place at the base where fueling takes place and will advise Customers accordingly.

If the aircraft is equipped with photoluminescent floor strip lighting, turn the lights to BRIGHT during refueling.

### Meal and Beverage Service Differences

Milk is provided on all military charter flights.

- Milk will be stowed by the catering agent or Provisioning Agent.
- If no Agent is available, the Flight Attendants will stow the milk in the following locations:
- -200: in an ice chest in the aft galley stowage module
- -300/-500/-700: in crates in the aft galley stowage module

The selling or serving of alcoholic beverages is prohibited on all military charters.

## 3.8.5 - Charter Checklist

If awarded a Charter flight, the following checklist can be used as a quick reference tool.

- ☐ Standard checkin of one hour prior to scheduled departure of charter in domicile where charter originates.
- ☐ Introduce yourself to your crew.
- ☐ The "A" Flight Attendant must obtain charter orders and review specific information pertaining to the charter. charter orders must be accessed on the SWA Intranet via a Company computer in the Flight Attendant lounge.
- ☐ Intranet instructions:
  1) Log on to SWA Intranet
  2) Click on DEPARTMENTS
  3) Click on SELECT A DEPARTMENT
  4) Click on INFLIGHT
  5) Click on CHARTER INFORMATION
  6) Scroll down the column labeled inflight and click on the applicable charter number. The date of the charter appears next to the charter number.
  7) Print these charter orders to take with you.
- ☐ "A" Flight Attendant briefs crew on charter information.
- ☐ Standard gate checkin of 30 minutes prior to departure.
- ☐ Upon boarding, if meal is provided, the "B" Flight Attendant counts the meals and reports count to the "A" Flight Attendant. "A" Flight Attendant verifies the meal count matches that of the charter orders.
- ☐ Any discrepancies should be discussed with the Operations Agent, Provisioning Agent or Caterer, whichever is applicable.
- ☐ Both "A" and "B" Flight Attendant ensure their galleys have been provisioned.
- ☐ Meals should be stowed in the OHBs.
- ☐ Follow any preflight instructions included on the charter orders.
- ☐ Tidy the cabin, fold blankets, and place pillows and blankets in OHBs. Refer to charter orders to determine if special arrangements have been made for additional cleaning crews.
- ☐ All boarding, taxi, PAs, briefings, and service procedures are followed as on a regularly scheduled flight.
- ☐ Meals should be served asap and not sit in the OHBs because of temperature concerns for certain food items.
- ☐ Some commercial charters have assigned seating. If there are any problems refer the problem to the Charter Operator Representative or Customer Service Representative.
- ☐ All Company policies, procedures, charter order information and FARs are adhered to.
- ☐ If overnight is required, refer to charter orders for accommodation and transportation information (they may differ from the crew hotel in cities in which we fly in our system). Inflight Crew Scheduling also has this information.
- ☐ Any problems with the operation of the charter itself, call Dispatch at 800-447-9291 and submit an Inflight & Provisioning Report.
- ☐ A reserve Flight Attendant assigned to a charter must check with Crew Scheduling after completion of the charter.

# Exhibit "C"

**KENNEY & MARKOWITZ L.L.P.**
**Attorneys at Law**
**255 California Street, Suite 1300**
**San Francisco, California 94111**
**Telephone: (415) 397-3100**

**E-mail: info@kennmark.com**
**Web Site: http://www.kennmark.com**
**Facsimile: (415) 397-3170**

# FACSIMILE COVER SHEET

**Date:** **April 22, 2005**

| **To:** | **Company:** | **Fax No:** |
|---|---|---|
| Steven M. Heller, Esq. | HELLER & HIBBERT | 916/858-0220 |

From: Jude A. Cisneros, Esq.

Regarding: LINDA BEATTIE, et al., v. SOUTHWEST AIRLINES, et al.

Our File: 301680-11/50

We're sending: 13 page(s), including this page.

Message:

**ORIGINAL TO FOLLOW VIA MAIL: YES ☐ NO ☒**

{30170.301680 0108012.DOC}

THIS FACSIMILE IS INTENDED ONLY FOR THE USE OF THE ADDRESSEE NAMED HEREIN AND IT MAY CONTAIN LEGALLY PRIVILEGED AND/OR CONFIDENTIAL INFORMATION. IF YOU ARE NOT THE INTENDED RECIPIENT OF THE FACSIMILE, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS FACSIMILE IS STRICTLY PROHIBITED. IF YOU RECEIVED THIS FACSIMILE IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL FACSIMILE TO US AT THE ADDRESS ABOVE VIA THE UNITED STATES POSTAL SERVICE. WE WILL REIMBURSE ANY COSTS YOU INCUR IN NOTIFYING US AND RETURNING THE FACSIMILE TO US. THANK YOU.

Jude A. Cisneros
E-mail: jcisneros@kennmark.com

# KENNEY & MARKOWITZ L.L.P.

ATTORNEYS AT LAW

255 California Street, Suite 1300
San Francisco, California 94111

Telephone: 415 397-3100
Facsimile: 415 397-3170
Web site: http://www.kennmark.com

April 22, 2005

**VIA FACSIMILE**

Steven M. Heller, Esq.
HELLER & HIBBERT
11335 Gold Express Drive
Suite 145
Gold River, CA 95670

Re: LINDA S. BEATTIE and BRUCE C. BEATTIE v. SOUTHWEST AIRLINES CO., et al.
Our File: 301680-11/50

Dear Mr. Heller:

In anticipation of Paula Gaudet's deposition at your office next Tuesday, April 26, 2005, we are enclosing a copy of Southwest's Disclosure of Supplemental Expert Report of Paula Gaudet, as well as the supplemental report without exhibits. The report with exhibits is too voluminous for faxing. We are having the disclosure, supplemental report and exhibits served via overnight mail.

Please feel free to call if you have any questions.

Sincerely,

JUDE A. CISNEROS

Enclosures

STEPHEN C. KENNEY (SBN 53883)
JUDE A. CISNEROS (SBN 220391)
ELIZABETH L. DOLTER (SBN 128457)
KENNEY & MARKOWITZ L.L.P.
255 California Street, Suite 1300
San Francisco, CA 94111
Telephone: (415) 397-3100
Facsimile: (415) 397-3170

Attorneys for Defendant
SOUTHWEST AIRLINES CO.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| LINDA S. BEATTIE and BRUCE C. BEATTIE,<br><br>Plaintiff,<br><br>v.<br><br>SOUTHWEST AIRLINES CO., and DOES 1-100,<br><br>Defendants. | CASE NO. S-03-1444 FCD PAN<br><br>**DEFENDANT SOUTHWEST AIRLINES CO.'S DISCLOSURE OF SUPPLEMENTAL EXPERT REPORT OF PAULA GAUDET** |

TO PLAINTIFFS AND THEIR ATTORNEY OF RECORD:

Pursuant to Rule 26(a)(2)(C) and Rule 26(e)(1) of the Federal Rules of Civil Procedure, defendant Southwest Airlines Co. ("Southwest") hereby supplements its previous disclosures concerning reports provided by the following expert who may be called as a witness at the trial of this case to provide testimony and/or other evidence under Federal Rules of Evidence 702, 703 or 705.

1. Paula Gaudet
Southwest Airlines Co.
P.O. Box 3611 HDQ9TR
2702 Love Field Drive
Dallas, TX 75235-1611
Telephone: 214-792-3266

A copy of Paula Gaudet's signed initial written report dated September 29, 2004, was attached to Southwest's expert disclosure served on September 30, 2004. A copy of the supplemental signed report prepared on or about April 21, 2005, is attached hereto as **Exhibit A**.

Discovery is continuing. Southwest, therefore, will produce any supplemental reports prepared by Paula Gaudet as required by Rule 26(a)(2)(C).

Southwest hereby reserves the right to supplement this expert witness disclosure for rebuttal witnesses in accordance with Federal Rules of Civil Procedure 26(a)(2)(C).

DATED: April 22, 2005

KENNEY & MARKOWITZ L.L.P

By: ______________________
STEPHEN C. KENNEY
JUDE A. CISNEROS
ELIZABETH L. DOLTER
Attorneys for Defendant
SOUTHWEST AIRLINES CO.

*Beattie v. Southwest Airlines Co.*
United States District Court, Eastern District (Sacramento) # S-03-1444 FCD PAN

**PROOF OF SERVICE**

[C.C.P.§2008, F.R.C.P. Rule 5]

I, the undersigned, state:

I am a citizen of the United States. My business address is 255 California Street, Suite 1300, San Francisco, California 94111. I am employed in the City and County of San Francisco. I am over the age of eighteen years and not a party to this action. On the date set forth below, I served the foregoing documents described as follows:

**DEFENDANT SOUTHWEST AIRLINES CO.'S DISCLOSURE OF SUPPLEMENTAL EXPERT WITNESS REPORTS OF DR. KEVIN D. HARRINGTON**

on the following person(s) in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

Steven M. Heller, Esq.
HELLER & HIBBERT
11335 Gold Express Drive, Ste. 145
Gold River, CA 95670
Facsimile: (916) 858-0220

[ ] BY FIRST CLASS MAIL – I am readily familiar with my firm's practice for collection and processing of correspondence for mailing with the United States Postal Service, to wit, that correspondence will be deposited with the United States Postal Service this same day in the ordinary course of business. I sealed said envelope and placed it for collection and mailing this date, following ordinary business practices.

[ ] BY PERSONAL SERVICE – Following ordinary business practices, I caused to be served, by hand delivery, such envelope(s) by hand this date to the offices of the addressee(s).

[X] BY OVERNIGHT MAIL – I caused such envelope to be delivered by a commercial carrier service for overnight delivery to the office(s) of the addressee(s).

[X] BY FACSIMILE – I caused said document to be transmitted by Facsimile machine to the number indicated after the address(es) noted above.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed this date in San Francisco, California.

Dated: April 22 2005

Rosie Reith

Kenney & Markowitz L.L.P.

# EXPERT OPINION REPORT

## *BEATTIE V. SOUTHWEST AIRLINES*

On September 29, 2004, I submitted my initial report on this case. I have now prepared a supplemental report. The materials I reviewed in formulating my opinions in this case are listed. My opinions and the bases for them are stated in this report.

### Education, Training and Experience

Attached is my resume which outlines my education, job history and airline industry experience. (Tab 1.)

### Work Performed

My work involved in this case includes the following: interviews of flight attendants; review of the materials listed in this report; preparation of a diagram of passenger seating; discussions with attorneys representing Southwest Airlines; and formulating my opinions.

### Materials Reviewed

I have reviewed the following materials:

- Plaintiffs Bruce and Linda Beattie's Complaint.
- Southwest's Answer.
- Linda Beattie's April 18, 2002, letter.
- Linda Beattie's discovery responses.
- Schematics of Boeing 737-500 on April 2, 2002, and reconfigured with "Spirit" interior.
- Seating Chart regarding Flight 794.
- Flight Tracking Search - Flight 794.
- In-Flight Reports of Andrew Kane, John Houpt, Victoria Seager Trujillo and Linda Beattie.
- Jason Gleim's April 2, 2002, note.
- Memo of a July 15, 2003, conversation between Andrew Kane and Sandra Moore.
- **Southwest Flight Attendant Manual pages.**

- Rule 26 Initial Disclosure of defendant Southwest Airlines Co.
- Plaintiff and Southwest's expert disclosure statements.
- My report dated September 29, 2004.
- Diane Laxineta's report dated December 29, 2004.
- Witness Deposition References Chart.
- Bruce Beattie deposition and exhibits thereto.
- Linda Beattie deposition and exhibits thereto.
- Lynette Blumhardt deposition and exhibits thereto.
- Sue Bristow deposition and exhibits thereto.
- Jason Gleim deposition and exhibits thereto.
- John Houpt deposition and exhibits thereto.
- Darren Johnson deposition and exhibits thereto.
- Frank Johnson deposition and exhibits thereto.
- Andrew Kane deposition and exhibits thereto.
- Damien Ladd deposition and exhibits thereto.
- Diane Laxineta deposition and exhibits thereto.
- Lorna Magnussen deposition and exhibits thereto.
- Victoria (Seager) Trujillo deposition and exhibits thereto.
- Gerald Uyeda deposition and exhibits thereto.
- Federal Airline Regulations
- My notes.

**In-Flight Reports**

During Flight 794 on April 2, 2002 ("Flight 794"), Linda Beattie filled out an In-Flight Report. (Tab 8.) Mrs. Beattie's report states:

> seated in aisle seat 5D, overhead laptop fell out onto head. Cracked head & right jaw pain. Headache. Stiff neck. Left eye twitch. 04/02/2002 about 9:00 a.m.

During Flight 794, Jason Gleim, a passenger on that flight, wrote a note which he handed to flight attendant Andrew Kane while on board the aircraft. (Tab 6.) Jason Gleim's handwritten note states:

> 4/2/02
>
> I saw the person who tried turning the bag that fell on that lady ... I would be willing to vouge that it wasn't yours or Southwest's fault, the bag was hanging by a "string" quote-unquote. If more info needed, I'm here.

During Flight 794, Andrew Kane completed an In-Flight Report. (Tab 7.) Andrew Kane's report attached Linda Beattie's report and Jason Gleim's note. His report also states:

> Some PAX. was moving luggage in bin to fit bags and a small lap top bag fell on lady and hit her in the head. I offered paramedics and gave ice, PAX said no paramedic needed.
>
> Witness #1 listed below wrote a note and I attached it.
>
> Also PAX. wanted to write what happened and I gave her an IPR, it is also attached.

Flight attendants John Houpt and Victoria Seager Trujillo completed In-Flight Reports which stated:

> I did not witness this incident.
>
> Andrew told me about it sometime during the flight. After learning about it, I did, in fact, check on the condition of the (injured) passenger as mentioned in his letter.
>
> (John Houpt Report, Tab 9.)

* * *

> Sorry don't know about incident.
>
> (Victoria Seager Trujillo Report, Tab 10.)

**Opinions**

My opinions are:

- With regard to Flight 794, Southwest Airlines complied with its in-flight standards and procedures. Those standards are consistent with the standards in the airline industry.
- Southwest Airlines personnel complied with the airline industry's standard of care with regard to Flight 794.
- Southwest Airlines could not reasonably have prevented the incident that occurred on Flight 794.

**Conclusions**

1. The Beatties' complaint alleges that Southwest negligently loaded luggage in an overhead bin on Flight 794. (Complaint, Tab 2.)

2. Those passengers on Flight 794 who have given deposition testimony in this case have described where they were sitting on the aircraft. I have prepared a diagram which reflects these passengers' seat assignments, according to the deposition testimony of the witnesses and the In-Flight Reports. (Seating Chart Diagram, Tab 5.)

3. The Customer Care chapter of Southwest's Flight Attendant Manual states Southwest's policy regarding carry-on items. All passengers may board an aircraft with a carry-on, plus a smaller, personal-type item, such as a purse. (Tab 3.) This policy is consistent with the airline industry's policy.

   The Customer Care Chapter of Southwest's Flight Attendant Manual lists the maximum dimensions of a carry-on item: 10 inches by 16 inches by 24 inches. (Tab 3.) This policy is consistent with the airline industry's policy.

   Garment bags are approved carry-on items, as are soft suitcases, like a duffel. (Customer Care Chapter of Southwest's Flight Attendant Manual, Tab 3.) This policy is consistent with the airline industry's policy.

   Sue Bristow testified that she saw a female passenger who boarded "later" place a duffel bag which was "not large" in the overhead bin above Linda Beattie's head. Darren Johnson testified that towards the latter part of boarding, he saw a male passenger place a bag about the size of Darren Johnson's laptop in that overhead bin. Linda Beattie testified that a female passenger who boarded "very late" placed a "typical rolling bag with an extendable handle" in that bin. Other witnesses either did not testify about a later-boarding passenger placing a bag in that overhead bin (Ladd, Uyeda, Frank Johnson, Magnussen) or do not recall the size of the bag placed in that bin by any such passenger (Blumhardt and Gleim).

(Witness Deposition References, Tab 12.) None of the independent witnesses used the word "oversized" to describe a bag placed into that overhead bin.

The bags described by Ms. Bristow, Mr. Johnson and Mrs. Beattie appear to be approved carry-on items.

4. From everything I have heard from the flight attendants and my review of the depositions, when the laptop bag fell, passenger boarding was still in progress and the cabin was not yet being secured for pushback.

5. Southwest's policies and procedures for boarding passengers are stated in its Flight Attendant Manual, Section 2. (Tab 3.) These policies and procedures for passenger boarding are consistent with the airline industry's standards for boarding of passengers.

Southwest complied with its own procedures and the airline industry standard of care for boarding of passengers. (Houpt, Kane and Trujillo Depositions, Tabs 16, 17 and 19.) There is no testimony to the contrary.

6. **Southwest's policies and procedures on stowage of luggage are stated in its Flight Attendant Manual, Customer Care Chapter. (Tab 3.) These procedures are consistent with the industry standards for stowage of luggage.**

Southwest complied with its policies and industry standards for stowage of luggage. There is no testimony or other evidence that an oversized bag was brought onto the aircraft by any passenger. Diane Laxineta testified that she concluded that a late-boarding passenger brought an oversized bag on board. (Laxineta Deposition, Tab 18.) Ms. Laxineta based this conclusion on the depositions of Sue Bristow and Linda Beattie. Sue Bristow testified that a passenger who boarded "later" brought a duffel bag that was "not large" onto the aircraft. Linda Beattie testified that a late-boarding passenger brought a bag onto the aircraft which was larger than a bag that Linda Beattie had checked. Mrs. Beattie agreed that the bag was a "typical rolling bag with an extendable handle." (Witness Deposition References, Tab 12.) Linda Beattie's April 18, 2002, letter mentioned that a female passenger brought a "large overnight bag" onto the aircraft. (Tab 13.) There is no evidence that any bag brought onto the aircraft exceeded the size limitations set forth in Southwest's Flight Attendant Manual.

Linda Beattie's April 18, 2002, letter states that the computer bag fell as Andrew Kane was walking down the aisle. (Tab 13.) In my experience in the airline industry, including my flight attendant and training experience and knowledge of aircraft, the motion of a person walking down the aisle of an aircraft cannot cause a bag to fall out of an overhead bin.

The handwritten witness statement of Jason Gleim and the In-Flight Reports by flight attendant Andrew Kane and Linda Beattie do not mention that any Southwest flight attendant touched, moved or rearranged the laptop bag in the overhead bin. The Gleim witness statement and the Kane and Linda Beattie In-

Flight Reports do not mention that any Southwest employee had anything to do with moving, rearranging or loading luggage in the overhead bin over Mrs. Beattie's head. (Gleim Witness Statement and Kane and Linda Beattie In-Flight Reports, Tabs 6, 7 and 8.)

Andrew Kane's In-Flight Report is consistent with what he related in his phone conversation with Sandra Moore of Southwest on July 15, 2003. (Kane In-Flight Report, Tab 7 and Memo of July 15, 2003 conversation, Tab 11.)

Lynette Blumhardt's deposition testimony is consistent with flight attendant Kane's In-Flight Report and his conversation with Sandra Moore on July 15, 2003. (Kane In-Flight Report, Memo of July 15, 2003, conversation, Witness Deposition References and Blumhardt Deposition, Tabs 7, 11, 12 and 15.)

The configuration of the aircraft used on Flight 794 is reflected in a schematic. (Schematic, Tab 4.) The configuration was not as described by Frank Johnson in his deposition. (Witness Deposition References, Tab 12.)

Several of the witnesses did not see the bag fall and were not looking in the area of the overhead bin which contained the laptop bag in the moments before the bag fell on Mrs. Beattie's head: Jerry Uyeda, Damien Ladd and Sue Bristow. (Witness Deposition References, Tab 12.)

Linda Beattie, Darren Johnson and Lorna Magnussen's accounts of the incident are not consistent with the In-Flight Reports and Jason Gleim's handwritten note. (Tabs 6-10.)

7. None of the flight attendants on Flight 794 recall any passengers coming up to them during the flight to complain about any involvement by Southwest's flight attendants in the incident. (Houpt, Kane and Trujillo Depositions, Tabs 16, 17 and 19.)

8. Southwest's policies and procedures for in-flight medical assistance to passengers are stated in its Flight Attendant Manual, First Aid Chapter. (Tab 3.) These policies and procedures for in-flight medical assistance are consistent with the airline industry's standards for in-flight medical assistance to passengers.

Southwest complied with the airline industry's standard of care for in-flight medical assistance. Mrs. Beattie was offered ice by at least one flight attendant. Mrs. Beattie was offered paramedic assistance shortly after the incident occurred, which she declined. Mrs. Beattie was examined on board the aircraft by flight attendant John Houpt, a former 30-year police officer with American Red Cross first-aid training, in addition to his Southwest first aid training. Mr. Houpt performed the same basic examination of Mrs. Beattie that he would have given a person in the course of encountering a head injury as a police officer. He could not find any obvious injury. The flight attendants checked on Mrs. Beattie several times during the flight. Flight attendant Houpt made a request for paramedics to meet Mrs. Beattie at the gate. Mrs. Beattie declined those paramedics' assistance.

(Witness Deposition References, Tab 12, Houpt and Kane Depositions, Tabs 16 and 17 and Witness Interviews.)

9. After considering all the facts and information available to me, Southwest complied with its own in flight standards and the airline industry's in-flight standard of care with regard to Flight 794. Southwest could not have reasonably prevented the laptop bag from falling from the overhead bin.

**Documents Attached to this Report**

**Tab 1:** My Resume.

**Tab 2:** Plaintiffs' Complaint.

**Tab 3:** **Flight Attendant Manual Excerpts.**

**Tab 4:** Diagram of Aircraft Configuration.

**Tab 5:** Seating Chart Diagram.

**Tab 6:** Jason Gleim's April 2, 2002, Note.

**Tab 7:** Andrew Kane's In-Flight Report.

**Tab 8:** Linda Beattie's In-Flight Report

**Tab 9:** John Houpt's In-Flight Report.

**Tab 10:** Victoria Seager Trujillo's In-Flight Report.

**Tab 11:** July 15, 2003, Memo of Conversation Between Andrew Kane and Sandra Moore.

**Tab 12:** Witness Deposition References.

**Tab 13:** Linda Beattie's April 18, 2002, Letter to Southwest

**Tab 14:** Linda Beattie Deposition Testimony.

**Tab 15:** Lynette Blumhardt Deposition Testimony.

**Tab 16:** John Houpt Deposition Testimony.

**Tab 17:** Andrew Kane Deposition Testimony.

**Tab 18:** Diane Laxineta Deposition Testimony.

**Tab 19:** Victoria Seager Trujillo Deposition Testimony.

**Prior Expert Testimony**

I have not previously testified as an expert.

**Publications**

I have not authored any publications in the last ten years.

**Compensation**

My compensation for offering expert testimony at deposition or trial is $150.00 per hour.

Paula Gaudet

PAULA GAUDET
Director of Inflight Standards
SOUTHWEST AIRLINES

## Section 5 - Carryon-Item Policy

All Customers and Employees may board with one carryon item plus a smaller, personal-type item. Personal items include purses, briefcases, and laptops (including case).

Crewmembers in full uniform may board with their normal complement of items.

### 5.1 - Sizing Boxes

Sizing boxes measuring 10x16x24 are at each station to help Customers and Employees determine if items can be carried aboard. Items that cannot be contained within the sizing box must be checked to the Customer's final destination. Assistive devices for the disabled are exempt from sizing-box criteria. See 5.3 - Irregularly Shaped Items for other exceptions.

### 5.2 - Carryon Items

The following guidelines apply to items carried onboard the aircraft.

- Carryon items must fit into a sizing box.
- Once onboard, a carryon item must fit under a passenger seat equipped with a restraint bar or in an approved OHB.
- Southwest will not accept any carryon item(s) that cannot be safely stowed in the passenger cabin of the aircraft. No carryon item will be accepted for transport in the cockpit, in a galley, in an aircraft lav or in any other area not specifically designated for the stowage and transport of carryon items.

#### 5.2.1 - Items Not Counted as Carryon Items

- assistive devices for Customers with qualified disabilities
- outer garments (e.g., overcoats or raincoats)
- approved child restraint devices (CRDs) which have been ticketed or for which complimentary, available space exists
- food-storage containers of working, deadheading, and commuting Crewmembers in uniform

### 5.2.2 - Approved Carryon Items

- garment bag
- briefcase
- shopping bag
- computer
- papoose-like baby carrier with hard, non-folding frame
- portfolio, provided a space in the onboard portfolio stowage compartment is available
- unapproved or unticketed CRD (such as a booster seat) which cannot or will not be used during movement on surface, takeoff, or landing
- cooler/styrofoam cooler
- suitcase (hard and soft)
- camcorder
- trade tools

### 5.3 - Irregularly Shaped Items

Items of reasonable size which protrude from only one side of the sizing box may be permitted onboard if they are not checkable.

- These items count as carryons (unless ticketed) and must fit into an OHB without unfairly depriving other Customers of OHB space.
- Irregularly shaped items can include but are not limited to:
  - musical instruments
  - blueprints
  - umbrellas
  - sports-related equipment (e.g., fishing poles) that can be folded down into a size that fits in the sizing box
  - professional TV cameras or camcorders




## 5.4 - Ticketed Articles and Boarding Verification Document

Customers will have the option of purchasing a ticket for delicate or larger items. A boarding verification document (BVD) will be issued at the ticket counter or gate for a ticketed item approved by Ground Operations, e.g., musical instruments, big gifts, etc. This document is also issued for a lap child. The BVD's purpose is to provide accountability for all persons and occupied seats..

BOARDING VERIFICATION DOCUMENT

FLT ____/____ DATE ________ ORIG ________ DEST ________

☐ NON-TICKETED LAP CHILD

NAME ______________________ AGE ________

CUSTOMER SIGNATURE ______________________

☐ TICKETED ITEM

ITEM ______________________

GATE AGT ______________

WN-304 (Rev. 5/94) TOP COPY - TICKET LIFT 2nd COPY - INFLIGHT

BOARDING VERIFICATION DOCUMENT

### 5.4.1 - Procedures

- The Customer will give the yellow copy of the BVD to the "A" Flight Attendant so that the Flight Attendant is aware of unticketed children or ticketed articles. Having this information will help to ensure an accurate Customer count.
- The yellow copy of the form can be thrown away at the end of the Customer's flight.

### 5.4.2 - Securing a Ticketed Item FAR 121.285

The item must:

- be secured in a seat with a seat belt or seat-belt extension
- be secured in the first row aft of a bulkhead or divider, starting window side (exception: OWWE lounge)
- not restrict access to an aisle or exit
- not block Customer view of NO SMOKING, FASTEN SEAT BELT or EXIT signs

## 5.5 - Scanning Point - Gate Area and Customer Boarding

CSAs and Operations Agents at the points of checkin and boarding, will scan the lounge and jetbridge areas to determine the acceptability of carryon items and ensure compliance with Southwest's carryon-item policy.

- Employees will refuse to allow any carryon items which do not comply with FARs and which cannot be reasonably or safely accommodated.
- Ramp Employees will assist by ensuring that items removed to the cargo holds are tagged and loaded for transport.
- Flight Attendants and Ground Operations Employees will also be prepared to tag and remove to the jetbridge any item that is inappropriate for onboard stowage.

## 5.6 - General Guidelines for Stowage of Carryon Items

Although the "A" Flight Attendant will have the ultimate responsibility for ensuring the proper stowage of all carryon items, all Flight Attendants are responsible for ensuring that carryon items are properly stowed in the OHBs.

Assisting Customers with their carryon items reduces the likelihood of injury or damage that might result from improper stowage, and is consistent with our policy of providing Positively Outrageous Service.

Guidelines for stowing carryon items are:

- Items must not be stowed in such a manner that they will interfere with access to emergency equipment, aisles, or exits.
- Items must not be stowed in a lavatory or any other non-approved stowage location.

- Politely encourage Customers to place heavy or hard-sided items, such as computers, under the seat.
- If hard-sided items are placed in the overhead bins, they should be flat on the floor of the bin.
- Ensure briefcases and other items are not stacked on top of each other in the overhead bins.
- When bins are full, attempt to find another location and inform the Customer of that location. It is permissible to stow luggage in the overhead bins designated for pillow and blanket stowage if that space is available.
- Take extreme care when opening any overhead bin to assist in the stowage of carryon luggage. Open the bin very slowly, using one hand to open the bin, keeping the other hand in a position that would allow you to prevent any luggage from falling out.
- When a cooler is brought onboard, it must be secured as any carryon item, under the seat or in an overhead bin. If a cooler contains ice, it is not to go in an overhead bin. Styrofoam coolers will not be checked.
- When bags must be checked, deliver the bag to the Ops Agent ensuring that the bags are tagged and that the Customer gets the claim check. Please be sure to ask the Customer for his final destination.

### 5.6.1 - Portfolio Compartment

All Southwest aircraft have a portfolio compartment in the aft section of the cabin. This space is limited and will be filled on a first-come, first-served basis.

## 5.7 - Gate-Checked Items—Claim-at-Gate Tag

Any item that a Customer needs immediately upon arrival can be checked at the gate or at the door of the aircraft and will be delivered to the door of the aircraft upon arrival. These items will be tagged with a destination tag and a CLAIM AT GATE tag.




This tag is used for:

- medical equipment such as personal wheelchairs
- baby strollers and car seats checked due to lack of space
- luggage of deadheading Flight Attendants who arrive at the gate too late to preboard with no space available on the aircraft to stow luggage. If deadheading in uniform, the Flight Attendant will retrieve luggage on the ramp upon arrival.

 

## 5.8 - One-Item Flights

When Customer loads are heaviest, Ground Ops can reduce the number of allowed carryon items to one, plus the exceptions listed in the Carryon-Item Policy.

- Only Ground Ops may impose this restriction.
- Stations have the responsibility and the latitude to determine which flights will be selected as one-item flights.
- This restriction will be imposed from the time the flight is opened to ensure fairness and to avoid undue hardship on the last boarding group(s).
- Working and deadheading crewmembers are exempt from this restriction.

THIS PAGE INTENTIONALLY LEFT BLANK